Beth CORCHADO, on behalf of her son, Sadrach Corchado, Plaintiff,

v.

BOARD OF EDUCATION, ROCH-ESTER CITY, SCHOOL DIS-TRICT, Defendant.

No. 99–CV–6494 (FE).

United States District Court, W.D. New York.

Feb. 18, 2000.

Jonathan Feldman, Public Interest Law Office of Rochester, Rochester, NY, for Beth Corchado, Sadrach Corchado, plaintiffs.

Donald T. Schmitt, Rochester City School District, Rochester, NY, for Board of Education of Rochester City School District, defendant.

## DECISION AND ORDER

FELDMAN, United States Magistrate Judge.

### Preliminary Statement

This is an action brought by plaintiff, Beth Corchado, on behalf of her son, Sadrach Corchado, (Sadrach) pursuant to the Individual with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 et seq., seeking review of a denial of educational benefits. The sole issue before this Court is whether Sadrach, a fourth grade student attending public school in the City of Rochester, qualifies for special education benefits under IDEA. The defendant determined that Sadrach did not qualify for benefits under IDEA and, on administrative review, an Impartial Hearing Officer (IHO) and a State Review Officer (SRO) agreed. For the reasons that follow, I find that Sadrach does qualify for IDEA benefits and, therefore, direct the defendant to develop and implement an individualized educational plan (IEP) for Sadrach pursuant to the IDEA.

### Factual Summary

The facts, as set forth in a detailed administrative record, are for the most part undisputed. Sadrach is a ten year old fourth grader who attends public School # 33 in the City of Rochester. Born in Puerto Rico after only eight months of gestation, Sadrach suffers from multiple and complex medical difficulties. The SRO summarized briefly Sadrach's medical history in his decision affirming the denial of IDEA benefits:

[Sadrach] was born in Puerto Rico and has reportedly had a life long seizure disorder, which may have been the combination of congenital measles and birth anoxia. A pediatric neurologist who examined the boy in November, 1994 reported that the child also has an attention deficit hyperactivity disorder (ADHD) with aggressive tendencies, a psychomotor delay, mild asthma and learning disabilities with possible mental retardation. He further reported that the child also had a tremor in his bilateral upper extremities. The pediatric neurologist expressed concern that the medication to control the child's seizure disorder was having a significant detrimental effect on his ADHD, and recommended a different combination of medications. The result of an EEG conducted during the examination were consistent with a tendency toward a focal seizure disorder. A second neurologist, who saw the boy in February, 1996, opined that he appeared to have a partial complex seizure disorder with secondary generalization.

In addition to his seizure disorder, tremors, and ADHD, the SRO also summarized Sadrach's medical history with respect to observed problems with the child's speech and language development:

In a speech/language evaluation conducted on May 23, 1995, the speech language pathologist noted that Spanish was the dominant language spoken in the home, but that the child was consid-

ered to be bilingual. The child received scores from one to three years below his chronological age on all tests of his expressive and receptive communication skills.

The medical record also confirms that Sadrach's language skills are complicated by the fact that he speaks with a lisp and stutters. In addition, Sadrach suffers from auditory deficiencies. As described in the SRO's decision, Sadrach was evaluated by a City School District audiologist in early 1996. "The audiologist indicated that the child had a fluctuating hearing loss which was expected to cause hearing difficulties in instructional situations." Although Sadrach completed first grade in 1996, he periodically needed home and hospital tutoring "because seizures and asthma prevented him from attending school."

Sadrach returned to school in September, 1996, to commence second grade. Due to academic and health related difficulties, Sadrach repeated the second grade in the 1997–1998 school year. In March of 1998, while Sadrach was repeating second grade, his mother completed a special education referral request seeking special education services for her son. Her request was referred to, and evaluated by, the school district's "Pupil Personnel Services Team" (PPST) who found that "Sadrach could be classified as a student with a 'Other Health Impairment,'" thus making him eligible for special education benefits. The PPST recommendation was referred to the district's Committee on Special Education ("CSE"). In May, 1998, the CSE rejected the PPST recommendation, finding that Sadrach had "made progress such that achievement is described as average for his grade placement" and that his noted medical problems "are not significantly impacting his overall progress."

Sadrach's mother decided to obtain an independent medical evaluation from the Genesee Developmental Unit ("GDU") at the Genesee Hospital. The GDU evaluation team was supervised by Dr. Miriam Halpern, a developmental pediatrician with the GDU. Dr. Halpern obtained her undergraduate degree from University of Michigan and her medical degree from the University of Rochester Medical School. She completed a pediatric residency at Oakland Children's Hospital and at Strong Memorial Hospital in Rochester. Dr. Halpern also completed a fellowship in developmental pediatrics at Strong Memorial and worked for five years as pediatrician at the Anthony Jordan Health Center, an inner-city HMO in Rochester.

As case manager for Sadrach, Dr Halpern herself conducted a neuro-developmental evaluation to determine what medical conditions Sadrach had. Dr. Halpern then referred Sadrach to other team members at GDU for specialized testing and evaluation in the areas of communication and education/academics. Each team member prepared a comprehensive report documenting their testing results and evaluative recommendations. After each team member had evaluated and tested Sadrach, the team again conferenced and prepared a detailed "Team Evaluative Summary."

The GDU reports are part of the administrative record and will not be repeated at length herein. Suffice it to say that the team members found Sadrach to suffer from significant learning disorders and/or neurological problems. For example, during her examination of Sadrach, Dr. Halpern observed Sadrach to have a seizure lasting approximately 30 seconds involving "significant tremulousness" of his right hand. Dr. Halpern also noted that Sadrach has "articulation difficulties," "difficulty with fine motor coordination" and "visual tracking problems." The GDU Communication Assessment found Sadrach's "language comprehension and expression abilities" to be "markedly diminished." He exhibited "diminished ability to register auditory information in short term memory." Overall, the communications assessment found Sadrach to suffer from "significant language weakness" to the point where "his language system is not able to cope with the demands of the

curriculum." The GDU "Educational Assessment" likewise found significant deficiencies. Testing found Sadrach to be reading at a beginning second grade level, his reading comprehension at an end of first grade level, math problem solving applications at an end of first grade level and math computation at a mid-second grade level. The evaluator concluded:

> Sadrach's performance within this evaluation setting indicates the need for additional educational support for him to meet the demands of the third grade curriculum. He has repeated second grade; however, skills have not developed to an end of second grade level. He presents as a youngster who has significant language needs....It is strongly suggested that Sadrach be referred to the Committee on Special Education to be identified as a youngster with special needs. Given his history of seizures and other medical issues, he should qualify within that realm if achievement scores are not thought to warrant labeling.

The Team Evaluation Summary diagnosed Sadrach as suffering from: (1) receptive and expressive language disorder; (2) articulation disorder; (3) seizure disorder; (4)significant processing deficits; (5) developmental reading disorder; and (6) developmental coordination disorder. The team concluded that "Sadrach should be considered as an Other Health Impaired Youngster and receive supportive services for all content areas."

After receiving a copy of the GDU assessment report, Sadrach's mother asked the CSE to reconsider its finding that the child was not eligible for special education services. Notwithstanding the GDU evaluation, findings and report, on November 13, 1998, the CSE again concluded that Sadrach was ineligible for special education services.[1] The CSE discounted the GDU report because "the testing was completed in English, which is not Sadrach's dominant language." Relying instead on district testing completed in the Spanish language in May 1998 which found Sadrach to have a full IQ of 130 (very superior range), the CSE concluded that Sadrach was non-disabled. As to his seizures and ADHD, the CSE concluded: "Although he presents with a seizure disorder and is diagnosed with ADHD, it does not appear to negatively impact on his academic performance in the classroom."

Sadrach's mother appealed the decision of the CSE to the IHO. A fact-finding hearing was held on January 28 and 29, 1999. The evidence at the hearing included testimony from Sadrach's mother, his teachers, members of the CSE committee and Dr. Halpern, as well as hundreds of pages of documentary evidence including report cards, testing results and the GDU report. In a decision dated February 13, 1999, the IHO affirmed the CSE's decision that Sadrach was ineligible for special education services. The IHO found that Sadrach "clearly has a number of difficulties," including ADHD (attention deficit hyperactivity disorder), a seizure disorder, asthma, stuttering, articulation problems, a lateral lisp, and "some degree of hearing difficulty." The IHO described the "crux of the issue" as to whether Sadrach's "educational performance was adversely affected by his difficulties to an extent warranting special education." As to this issue, the IHO found that despite his "difficulties," Sadrach "is achieving at his current grade level in regular education." According to the IHO, "if student (sic) is able to achieve satisfactorily academically, his problems do not rise to a level satisfying the definitional standards" for special education services.

As to the GDU report and assessment, the IHO agreed that the report documented "lower achievement score and a host of learning/educational problems ranging

---

1. Ms. Johnson, the chair of the CSE committee, testified that it was "uncommon" for the CSE committee to reject the recommendation of both a PPST and an independent evaluation such as the GDU report. Transcript at page 94.

from speech/language issues to a reading disorder." The IHO found the GDU report and Dr. Halpern's hearing testimony "impressive" and agreed that if the GDU results were "accepted," Sadrach would meet the eligibility requirements for special education. Nevertheless, the IHO discounted the GDU report, not because the testing was conducted in English, but rather because the GDU evaluators had never observed Sadrach in school or "talked to his teachers at length." In resolving what the IHO perceived as a "conflict" between the teachers observations of Sadrach and the findings of the GDU evaluators, the IHO ruled that "one must give greater deference to those actually observing the student in school, those teaching him and charting his progress." According to the IHO, "[w]hat is left then is a student who is shown by the evidence here to be achieving satisfactorily at grade level." Accordingly, the IHO concluded that Sadrach was not eligible to be classified for special education.

On March 25, 1999, Sadrach's mother appealed the IHO's ruling. Almost six months later, the SRO officer affirmed the decision of the IHO. After summarizing the record, the SRO found, *inter alia*, that "the child's educational performance has consistently been in the average range and both the private assessment [GDU] and [the school district's] academic evaluations show that the child was functioning at, near or slightly below grade level." The SRO found that although Sadrach's "IQ scores place him in the superior range of intellectual functioning, and his academic performance is in the average range, it is not clear that the child requires special education services." The SRO concluded that "the child's medical conditions did not adversely impact his academic performance to the extent he required special education or related services."

On October 15, 1999, the instant action was commenced in federal court seeking judicial review of the state administrative proceedings. By stipulation dated November 19, 1999, the parties consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c) and thereafter filed cross-motions for summary judgment. A briefing schedule was agreed upon and oral argument on the cross-motions was heard by this Court on February 14, 2000. Due to the urgency inherent in determining Sadrach's eligibility for special educational services, this Court agreed to decide the cross-motions on an expedited basis.

## Discussion

▮▮▮ *Standard of Review:* In reviewing whether a particular educational plan adopted by a school district meets the requirements of IDEA, the Court must normally afford substantial deference to the determinations of state and local officials who possess the "expertise in the formulation of educational programs for the handicapped." *Briggs v. Board of Educ. of State of Conn.*, 882 F.2d 688, 693 (2d Cir.1989). *See Board of Educ. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)(deference to the findings of state and local agencies secures that federal courts do not "impos[e] their view of preferable educational methods upon the States"). Where, however, the issue before the Court is "whether the school district properly classified [the student] as an individual with or without a disability in the first instance," the Court is *not* bound by the rule of deference. *Muller v. Committee on Special Educ.*, 145 F.3d 95, 102 (2d Cir.1998). Whether a particular child's deficits satisfy the eligibility definitions set forth in relevant state and federal regulations is a matter of statutory interpretation and "the state administrative officials [are] in no better position than the district court to make conclusions with respect to [the student's] statutory eligibility based on the record." *Id.* Accordingly, and consistent with *Muller,* this Court is "free to consider the issue of [Sadrach's] statutory eligibility de novo." *Id.*

2. *Eligibility For Services:* The purpose of the IDEA is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d). In enacting the IDEA, Congress declared that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1).

 Given the broad scope of the legislation, it is not surprising that the Act as well as its implementing regulations take an inclusionary approach in defining the term "child with a disability" and embrace within its scope children who suffer from a wide variety of deficits including hearing impairments, speech or language impairments, visual impairments, serious emotional disturbance, learning disabilities, orthopedic impairments and "other health impairments." 20 U.S.C. § 401(3)(A); 34 C.F.R. § 300.7. Once a child is determined to meet the definitional standard of a "child with a disability," the school district is required to formulate an individualized education program (IEP) "reasonably calculated to enable the child to receive educational benefits." *Board of Educ. v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

 As stated earlier, the issue here is the threshold one: Does Sadrach's documented disabilities meet the eligibility requirements entitling him to the benefits of special education and related services under the IDEA? Sadrach's mother submits that the administrative record in this case demonstrates that her son meets three distinct disability classifications: (1) "Other Health Impaired"; (2) Speech Impaired; and (3) Learning Disabled. Each classification is discussed below.

A. *"Other Health Impaired":* Under applicable regulations, a child is eligible for special education services under the "Other Health Impaired" classification if the child has a condition that limits strength, vitality or alertness resulting in limited alertness to the educational environment and adversely effects educational performance. 34 C.F.R. § 300.7(b)(8); 8 N.Y.C.R.R. § 200.1(mm)(10). The administrative record in this case thoroughly documents Sadrach's long term seizure disorder. The recurrent seizures caused him to miss many days of school, both as a result of the seizures themselves and so that he could attend medical appointments.[2] Although adjustments in medication appear to have significantly reduced absences, the administrative record pays tribute to the fact that Sadrach continues to have regular uncontrolled seizures which affect his alertness in class. Dr. Halpern testified that during her neurological examination of Sadrach she observed him experience a seizure of approximately thirty seconds. The seizure occurred during a writing exercise.

> [W]hile he was writing and he was writing slowly and carefully and suddenly his arm began to shake, he couldn't control the pencil and there was simultaneously some, what I'll call psychomotor retardation, everything kind of slowed down. He was obviously having a seizure at that moment, it lasted probably, at the most 30 seconds, its hard to judge time in those kinds of episodes.

Transcript at page 133–34. Dr. Halpern was specifically asked her medical opinion as to what effect such seizures have on academic performance. She answered:

> There is no hard and fast rule about how seizures affect performance, however, seizures definitely do disrupt the learning process not just while they occur but for a post seizure period. They affect memory and memory and learning go

2. The SRO noted in his decision that during the 1996–1997 school year (Sadrach's first attempt at second grade), he had 21 excused and 6 unexcused absences from school.

hand in hand. This means, now [Sadrach's] mother reported at the time of the evaluation that Sadrach was having approximately one seizure every two weeks. Those are noticed by her. My suspicions, therefore, if she notices them twice a month or so, they are probably occurring more often. Which could mean that for a period of time during his day, he is not a learner, he is not physiologically able to encode new information into his memory.

Transcript at 139. Dr. Halpern's testimony takes on added significance when considered in conjunction with the documented observations and testimony of Sadrach's teachers. For example, Ms. Poventud, Sadrach's second grade teacher at School 33, testified about witnessing Sadrach experience seizures during class and their impact on his alertness.

> On *many occasions* he had silent episodes where the seizures were so unnoticeable that the kids would not notice that he was having a seizure, but he was, I would describe it like he *was spaced out and just staring for a few minutes* and then he would regain his composure and, and *he wouldn't know what we were talking about in class* so I would repeat, I would repeat what we, we were discussing whether it was math or science or social studies for his benefit.

Transcript at page 46 (emphasis supplied). Ms. Poventud also testified that she noticed "tremor in his hands that was constant." *Id.* Given that Ms. Poventud is responsible for twenty or more other students in her class, it is unlikely that she (or any teacher, for that matter) would be able to detect and observe each seizure Sadrach suffers. Indeed, in a report Ms. Poventud prepared for the GDU evaluation team she noted that "Sadrach has

difficulties focusing in class for prolonged periods of time." [3]

The expert medical opinions of Dr. Halpern are unrebutted in the administrative record. The district did not present any evidence, either in the form of an expert's report or direct testimony from a medical professional, that Sadrach's seizures would not adversely affect his ability to concentrate, focus and learn. Given the strong correlation between the medical opinion of Dr. Halpern and the classroom observations of Ms. Poventud, the record strongly supports a finding that Sadrach has a condition that results in "limited alertness with respect to the educational environment" and which has adverse effects on Sadrach's educational performance. 34 C.F.R. § 300.7(b)(8).

B. *Speech Impaired:* Sadrach's history of speech impairment is also well documented in the administrative record. His mother reported that he did not begin to speak until he was three years old. As noted by the SRO, in a speech and language evaluation completed in May 1995 by ARC of Monroe County, Sadrach "received scores from one to three years below his chronological age on all tests of his expressive and receptive communication skills." Ms. Poventud testified that Sadrach's stuttering made him "frustrated because he couldn't get his message through." She observed that Sadrach stuttered "a lot" regardless of whether he was speaking Spanish or English. Transcript at 46–47.[4] In her March, 1998, report to the GDU, Ms. Poventud noted that Sadrach's "articulation in Spanish or English tends to be segmented (stutters a lot). Seems to have difficulties putting his thoughts in a logical order and verbalizing them."

---

**3.** Ms. Osbourne, another of Sadrach's second grade teachers also regularly observed him experiencing seizures. She testified that Sadrach "sometimes blanked out" and "isn't there" during the seizures, but then "comes back." Transcript at page 119. Ms. Osbourne estimated she observed these episodes

"at least once a week" and they lasted "anywhere from a few seconds to a minute." *Id.*

**4.** Ms. Osboune testified that she too observed stuttering, but that she did not believe it adversely impacted Sadrach's academic performance. Transcript at page 120–21.

The GDU evaluation substantiates Ms. Poventud's classroom observations. In her detailed report, the GDU speech/language pathologist wrote that diagnostic test results indicated deficits in "Sadrach's ability to register auditory information in short term memory, integrate information in active working memory, and process information at the phonological level." The evaluator found that Sadrach had "diminished vocabulary understanding," had "difficulty retrieving information from memory" and "verbal organization difficulties." Although Sadrach had received his "usual dose of pyschostimulant medication prior to testing," the evaluator still found evidence of his ADHD and noted "fidgety behavior, impulsivity and distractibility" during the evaluation. The evaluator opined that Sadrach's communication, comprehension, memory and expression problems would impact his academic performance.

> Academically, this will impact ability to sustain the logical development of ideas when performing written language tasks. Reading comprehension will also be impacted in that Sadrach will be unable to retain information at the beginning of a passage while reading to the end of the passage. Processing ability was further compromised by slow rate. Slow rate of processing is frequently evident in individuals who exhibit difficulty accessing memory.

The speech pathologist concluded that Sadrach's "language system is not sufficient to cope with the demands of the curriculum" and "strongly recommended" speech and language therapy.

Sadrach meets the eligibility requirements for being classified as having a "speech or language impairment" if he has a "communication disorder, such as stuttering, impaired articulation, a language impairment or voice impairment, that adversely affects" his educational performance. 34 C.F.R. § 300.7(c)(11). My review of the record here supports a finding that Sadrach meets the requirements of being "speech or language" impaired.

3. *Learning Disabled:* Federal regulations define a "learning disabled" child as one who has a "severe discrepancy between achievement and intellectual ability" in one or more of several listed areas, including "oral expression, listening comprehension, basic reading skills, and reading comprehension" 34 C.F.R. § 300.541. State regulations provide that the required "discrepancy" must be a "discrepancy of 50 percent or more between expected achievement and actual achievement determined on an individual basis." 8 N.Y.C.R.R. § 200.1(mm)(6).

The district's own psychological testing results acknowledge a startling discrepancy between Sadrach's intellectual ability and his academic achievement. Assuming they are accurate, district test results from May, 1998, establish that Sadrach has an overall I.Q. of 130, placing him in the "very superior" range of intelligence. Absent some underlying learning disorder, one would not expect a child with superior intelligence to have to repeat the second grade and have such relatively low academic achievements. Indeed, Mrs. Greenfield, the school psychologist who served on Sadrach's CSE committee, testified that Sadrach met the 50% "significant discrepancy" standard as to written language skills. Transcript at page 37. Ms. Johnson, a special education teacher and the Chair of Sadrach's CSE, committee testified that the discrepancy between Sadrach's intellectual abilities and his reading test scores "could be described as severe." Transcript at 92. The regulations do provide that the classification of learning disabled is not warranted if the discrepancy between ability and achievement is primarily the result of visual or hearing, or motor impairment, mental retardation, emotional disturbance or environmental, cultural or economic disadvantage. 34 C.F.R. § 300.541(b); 8 N.Y.C.R.R. § 200.1(mm)(6). There simply is nothing in this record, however, to attribute Sadrach's discrepancy to any of the excluded factors.

Based on the foregoing, Sadrach does meet the eligibility requirements for the classification of having a "learning disability."

4. *Impact of Academic Performance on Eligibility for Special Education Services:* Although this Court reviewed the administrative record *de novo*, it did give attention and consideration to the IHO and SRO's reasoning that Sadrach's "average" performance in school was an indication that he did not qualify for special education services. The IHO expressed his view in this regard in no uncertain terms:

> The district *properly contends* that, whatever student's difficulties, if student is able to achieve satisfactory academically, his problems do not rise to a level satisfying the definitional standards in the regulations. While the student has a number of problems, the evidence in the record shows he is achieving satisfactorily in school. He is achieving at an average level at his current grade level in regular education.

(emphasis added).

■ While the Court, for the reasons set forth in this decision, does not agree with the IHO's view of what the record shows regarding Sadrach's academic "achievements," the IHO's reasoning also signals what this Court believes is a fundamental error in determining eligibility for special education services. The IHO's reasoning, in effect, precludes a child whose academic achievement can be described as "satisfactory" from being able to demonstrate that documented disabilities adversely affected the student's academic performance. This should not and cannot be the litmus test for eligibility under the IDEA. The fact that a child, despite a disability, receives some educational benefit from regular classroom instruction should not disqualify the child from eligibility for special education benefits if the disabilities are demonstrated to "adversely

affect *the child's* educational performance." 34 C.F.R. 300.7 (emphasis added). Likewise, not every child who has a disability needs special education services as a result of that disability. Each child is different, each impairment is different, and the effect of the particular impairment on the particular child's educational achievement is different. While Sadrach's academic performance in relation to his peers is one of many tools that may be considered in determining "adverse affect", denying him special education benefits because he is able to pass from grade to grade despite documented impairments that adversely affect *his* educational performance is wrong.

### Conclusion

For the reasons set forth in this decision, I find that Sadrach Corchado is eligible for special education under the Other Health Impaired, Speech Impaired and Learning Disabled classifications. Accordingly, plaintiff's cross motion for summary judgment is **granted** and defendant's cross motion for summary judgment is **denied.**[5]

**IT IS SO ORDERED.**

---

5. The Second Circuit has not yet ruled on who bears the burden in federal suits seeking relief under the IDEA. *See generally Wall v. Mattituck–Cutchogue School Dist.,* 945 F.Supp. 501, 509 (E.D.N.Y.1996)(summarizing the state of the law). For purposes of this Decision, I have assumed that the plaintiff bears the burden of proof.