**ELIDA LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, Plaintiff**

**v.**

**Susan ERICKSON, et al., Defendants**

**No. 3:02CV7183.**

United States District Court,
N.D. Ohio,
Western Division.

Feb. 26, 2003.

Corie Marty Judge, Scott, Scriven & Walhoff, Julie C. Martin, Scott, Scriven & Wahoff, Columbus, for Elida Local School District Board of Education, Plaintiff.

Ron Nisch, Mickel & Huffman, Toledo, Thomas J. Zraik, Sylvania, for Susan Erickson, a minor, by and through her parent and next friend, Defendant.

## ORDER

CARR, District Judge.

This is a suit by a school district against a student and her mother to review a finding that the child is entitled to special educational services under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et. seq.* and analogous state law, Ohio Rev.Code § 3323.01 *et seq.* This court has jurisdiction pursuant to 28 U.S.C. § 1331. Pending are defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 and plaintiff's cross motion for judgment on the record. For the

following reasons, defendants are granted judgment based on the administrative record.

## BACKGROUND

In 1994, at age seven, Susan Erickson was diagnosed with leukemia. Susan has since suffered physical and neurological problems as a result of radiation and chemotherapy treatments.

Throughout elementary and junior high school, Susan was identified as a "child with a disability" under § 1401(3)(A) of the IDEA. The term "child with a disability" means a child:

(i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (hereinafter referred to as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, *other health impairments*, or specific learning disabilities; and

(ii) who, by reason thereof, needs special education and related services.

(emphasis added).

Susan was classified as having an "other health impairment." She therefore received special educational services, pursuant to various Individual Education Plans ("IEPs").

In February, 2001, while Susan was in the eighth grade, plaintiff school district initiated a Multi–Factored Evaluation ("MFE") of Susan to determine if Susan continued to qualify under the "other health impairment" designation, if Susan had a "specific learning disability" under § 1401(3)(A), and if special education services were no longer required.

In August, 2001, the MFE team—comprised primarily of high school teachers and other service providers—concluded that Susan was no longer eligible for services under an IEP with a designation as

"other health impairment." According to the MFE Report, Susan's "academic achievement was commensurate with her general Intellectual Ability level indicating no continued severe adverse affect [sic] on her edu[cation]." Bd. Ex. 88.

Pursuant to the IDEA, Susan and her mother requested an impartial due process hearing to review the MFE team decision. In December, 2001, the Impartial Hearing Officer ("IHO") ruled that the MFE team did not comply with the IDEA's procedural safeguards. He therefore ordered the school district to continue services to Susan under her eighth grade IEP until the school district could reevaluate Susan.

The school district appealed the IHO's decision to the state education agency. In February, 2002, the State Level Review Officer ("SLRO") concluded: "the decision of the IHO is affirmed in all respects with the further interpretation that the Student qualifies for Special Education services under the designation of Other Health Impaired."

The school district appeals the SLRO decision in this court under § 1415(i)(2) of the IDEA. Plaintiff requests this court to conduct a *de novo* review of the legal issues appealed, overrule the decision of the SLRO, declare that the SLRO erred in holding that Susan is eligible for special education services under the IDEA, and find that Susan is not a child with a disability eligible for special education services.

Defendants move for summary judgment. Plaintiff has filed a cross motion for judgment based on the administrative record.

## DISCUSSION

The IDEA provides federal funds to assist state and local agencies in educating children with disabilities, and conditions

funding on a State's compliance with extensive goals and procedures. *Bd. of Educ. of Hendrick Hudson Central School Dist. v. Rowley,* 458 U.S. 176, 180, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).The purpose of the IDEA is "to assure that all children with disabilities have available to them a free appropriate public education which emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living; ..." § 1400(d)(1)(A).

■ A "free appropriate public education" under the IDEA is tailored to the unique needs of the child by means of an IEP. *Rowley,* 458 U.S. at 181, 102 S.Ct. 3034. IEPs are detailed written statements arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the child's education, and specifying the services the child will receive. §§ 1401(11); 1414(d).

■ In addition to the IEP, the IDEA imposes extensive procedural requirements. Complaints brought by parents or guardians must be resolved at "an impartial due process hearing," and an appeal to the state educational agency must be provided if the initial hearing is held at the local or regional level. Thereafter, any party aggrieved by the findings of the state administrative hearing has "the right to bring a civil action with respect to the complaint ... in a district court of the United States without regard to the amount in controversy." *Id.* at 182, 102 S.Ct. 3034 (quoting § 1415(i)(2)).

Additionally, to qualify for federal assistance, states must enact policies and procedures which are consistent with the IDEA requirements. Ohio has done so through Chapter 3323 of the Revised Code. *Bd. of Educ. of Austintown Local School Dist. v. Mahoning County Bd. of Mental Retardation and Dev. Disabilities,* 66 Ohio St.3d 355, 360, 613 N.E.2d 167 (1993).

## I. Standard of Review Under IDEA

■ The IDEA's provision governing federal court review of state administrative decisions states: "the court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." § 1415(i)(2)(B).

Courts have interpreted this standard of review as "modified de novo." *Burilovich v. Bd. of Educ. of Lincoln Consol. Schools,* 208 F.3d 560, 566 (6th Cir.2000) (citing *Renner v. Bd. of Educ.,* 185 F.3d 635, 641 (6th Cir.1999); *Metropolitan Bd. of Pub. Educ. v. Guest,* 193 F.3d 457, 463–64 (6th Cir.1999)). The standard stems from the Supreme Court's holding that courts must give "due weight" to the state administrative proceeding. *Id.* (citing *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034).[1]

In *Burilovich,* the Sixth Circuit clarified the meaning of the *Rowley* "due weight" standard:

> We have held that a court cannot simply adopt the state administrative findings without an independent re-examination of the evidence. We have also indicated that the weight due will vary, depending on whether the court is reviewing procedural or substantive matters and whether educational expertise is essential to the administrative findings.

**1.** In *Rowley,* the Supreme Court stated: "the fact that § 1415[ (i) ] requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings." 458 at 205 at 206.

With regard to procedural matters, a court should "strictly review an IEP for procedural compliance," although technical deviations will not render an IEP invalid *Dong v. Bd. of Educ.*, 197 F.3d 793, 800 (6th cir.1999).... As for substantive issues, "the 'preponderance of the evidence' language in the [IDEA] 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *See Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir.1990)....

208 F.3d at 565–66.

Regarding the summary judgment standard of review, the Sixth Circuit concluded:

> In a case involving a motion for summary judgment, the court should still apply modified de novo review, but must ensure that there are no genuine issues regarding the facts essential to the hearing officer's decision. In rendering its decision, the court may still rely upon the hearing officer's presumed educational expertise, as long as the material facts underlying the officer's determination are not in dispute.

*Id.* at 567 (citations omitted).

Under *Burilovich*, district courts cannot simply adopt state administrative findings without an independent re-examination of the evidence. On procedural matters, the court will strictly review technical deviations. On substantive matters where educational expertise is required, the court will defer to the state agency's reasonable decision.

■ If the re-examination reveals, however, that material facts are in dispute, summary judgment is inappropriate. *Doe v. Metropolitan Nashville Public Schools*, 133 F.3d 384, 387 (6th Cir.1998) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "Summary judgment requires that there

be no disputed issues of material fact; that the facts be viewed in the light most favorable to the non-movant; and that the movant be entitled to a judgment as a matter of law." *Id.* at 387 n. 2 (citing Fed. R. Civ. Pr. 56(c) and *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505).

If summary judgment is inappropriate, the district court may still decide the issues before the court based on the administrative record. As the Sixth Circuit explained in *Nashville Public Schools*, 133 F.3d at 387 n. 2:

> If neither party has expressed a desire to put on evidence beyond that in the administrative record, as allowed by 20 U.S.C. § 1415(e)(2), the district court could have decided this case at the same stage in the proceedings, but such a decision would not have been summary judgment.... It is true that a district court in that situation would have nothing to do other than to decide the case based on the record.... There is no good reason, however, to confuse matters by allowing this to be called summary judgment.

In this case, defendants move for summary judgment, arguing that the SLRO's decision was justified and there are no material facts in dispute. Plaintiff moves for judgment based on the administrative record. Plaintiff argues the SLRO erred and there are material issues of fact that this court should resolve in its favor.

## II. Burden of Proof

Plaintiff alleges that the SLRO's decision must be reversed because the SLRO erred in holding that the burden of proof was properly assigned to the school district at the impartial due process hearing stage.

In his decision, the SLRO stated:

> The burden of proof in any case will shift in response to the amount of evi-

dence produced by each side. A reading of the transcript of the Impartial Due Process Hearing indicates that both sides vigorously presented their side of the case. The issue of going forward in these cases is one discussed frequently by the courts. The SLRO finds that seldom does a court overturn a decision based on whose obligation it was to go first or who formally had the burden of proof on a particular issue. Many Due Process Hearings are conducted without legal counsel on one side. The hearings can be somewhat informal. Justice cannot always be adhering to a strict set of procedural and evidentiary rules. It is the SLRO's finding that, even if the parents had been forced to go first in this matter, the IHO's decision would have been the same based upon the testimony and the evidence presented. Decision of SLRO at 7.

According to plaintiff, traditional burden of proof standards require the burden to be assigned to the party bringing the action. In this case, because the Ericksons filed the request for a due process hearing, plaintiff argues the Ericksons should have had the burden of proof at the due process hearing and at the state level review.

The Sixth Circuit has not expressly stated which party has the burden of proof when appealing an MFE decision on eligibility for special education services. The Sixth Circuit has, however, held that a party challenging the terms of an IEP bears the burden of proving that the educational placement established by the IEP is not appropriate. *Doe v. Defendant I,* 898 F.2d 1186, 1191 (6th Cir.1990) (citing *Tatro v. Texas,* 703 F.2d 823, 830 (5th Cir.1983), *aff'd in part, rev'd in part, on other grounds, sub nom. Irving Indep. School Dist. v. Tatro,* 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984)).

In *Tatro,* the Fifth Circuit was the first to hold that the party attacking the terms of an IEP bears the burden of showing why the IEP is deficient. 703 F.2d at 830. The court explained:

> We are convinced that the central role of the IEP in the educational scheme contemplated by the [IDEA] and in the standard of review developed in *Rowley* gives rise to a presumption in favor of the educational placement established by [a student's] IEP. Moreover, because the IEP is jointly developed by the school district and the parents, fairness requires that the party attacking its terms should bear the burden of showing why the educational setting established by the IEP is not appropriate.

*Id.* (citations omitted).

In this case, the school district created the MFE team, *inter alia,* to reevaluate Susan under the category of "other health impairment." According to the school district, the evaluation was necessary—even though it was prior to Susan's next regularly scheduled evaluation—because Susan was entering high school and seven years had passed since she was treated for cancer. Because of the MFE team's conclusion that Susan did not continue to qualify for special education services under the "other health impairment" designation, the school district intended to terminate Susan's IEP.

In effect, by concluding that Susan was no longer eligible, the school district attacked the validity of Susan's eighth grade IEP. It was the school district, therefore, which sought to change the child's status quo from qualified under the "other health impairment" designation to ineligibility for special education services, which includes an IEP. Under the reasoning of *Tatro,* which the Sixth Circuit adopted in *Doe v. Defendant I,* the burden of proof was properly assigned to the school district.

## III.  Alleged IDEA Violations

In its complaint, plaintiff makes the following assertions:

¶ 23.  The state level review officer exceeded his authority in ruling beyond the assignments of error raised on appeal, and his decision in that regard must be reversed.

¶ 25.  The state level review officer erred in holding that the multifactored evaluation team was not appropriately comprised, and his decision in that regard must be reversed.

¶ 26.  The state level review officer erred in finding that the multifactored evaluation team did not carefully consider all relevant data, and his decision in that regard must be reversed.

¶ 27  The state level review officer erred in holding that Susan is qualified for special education and related services under other health impairment category, and his decision in that regard must be reversed.

¶ 28.  The state level review officer erred in holding that the impartial hearing officer found Susan to be qualified for special education and related services under the category of other health impairment, and his decision in that regard must be reversed.

Defendants contend that the decisions of the IHO and SLRO are justified, reasonable, and supported by the evidence, and, therefore, must be affirmed.

**2.**  Section 300.344, entitled "IEP team," provides:

(a) The public agency shall ensure that the IEP team for each child with a disability includes -

(1) The parents of the child;

(2) At least one regular education teacher of the child (if the child is, or may be, participating in the regular education environment);

(3) At least one special education teacher of the child, or if appropriate, at least one special education provider of the child;

## A.  Alleged Procedural Violations

### 1.  MFE Team Composition

■  Plaintiff argues that defendants, the IHO, and the SLRO misinterpret the IDEA's regulations by erroneously concluding that the August, 2001, MFE team was not comprised of the appropriate members.  The IHO and the SLRO concluded that because none of Susan's eighth grade teachers were included as members of the August, 2001, MFE team, plaintiff violated the procedural safeguards of the IDEA.

Section 1414(c)(5) of the IDEA, entitled, "Evaluations before change in eligibility," states: "A local educational agency shall evaluate a child with a disability in accordance with this section before determining that the child is no longer with a disability."

Section 1414(c)(5)'s implementing regulations state that "[a] public agency must evaluate a child with a disability in accordance with § § 300.532 and 300.533 before determining that the child is no longer a child with a disability."  34 C.F.R. § 300.534(c)(1).  Section 300.532 describes what kinds of tests are to be administered for initial and reevaluation purposes.  Section 300.533 describes how the school district is to determine what evaluation data are needed to make an evaluation.

Section 300.533(a) states that as part of any reevaluation . . . a group that includes the individuals described in § 300.344 [2],

(4) A representative of the public agency who—

(i) Is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities;

(ii) Is knowledgeable about the general curriculum; and

(iii) Is knowledgeable about the availability of resources of the public agency;

(5) An individual who can interpret the instructional implications of evaluation results, who may be a member of the

and other qualified professionals shall—

(1) Review existing evaluation data on the child, including—

(i) Evaluations and information provided by the parents of the child;

(ii) Current classroom-based assessments and observations; and

(iii) Observations by teachers and related service providers; and

Subsection (2) of § 300.533(a) then instructs that the IEP team must identify, on the basis of the review of the existing evaluation data, what additional data, if any, are needed to determine:

(iii) Whether the child needs special education and related services, or in the case of a reevaluation of a child, whether the child continues to need special education and related services....

Plaintiff followed these procedural guidelines under §§ 300.532 and 500.533. In February, 2001, the school district decided to reevaluate Susan. The district formed a properly composed IEP team, under §§ 300.533(a) and 300.344. The IEP team included Susan's eighth grade teachers and other individuals with first hand knowledge of Susan. This group decided what data they possessed and what additional data were required for a reevaluation.

Section 300.534 of the regulations details how a determination of eligibility is thereafter made. It provides:

(a) Upon completing the administration of tests and other evaluation materials—

(1) A group of qualified professionals and the parent of the child must determine whether the child is a child with a disability, as defined in § 300.7; . . .

Plaintiff followed this procedural guideline as well. In August, 2001, a "group of qualified professionals" and the parent—the August, 2001, MFE team—met to determine Susan's eligibility. There is no evidence that the August, 2001, MFE team was not "qualified." In attendance were the school district's special education officer, special education tutor, high school guidance counselor, high school principal, a psychologist, occupational therapist, and work-study coordinator from the county education service center.

Although it seems surprising that none of Susan's former teachers were members of the August, 2001, MFE team, plaintiff's interpretation of the regulations is correct. Under § 300.534, the August, 2001, MFE team was not required to include a current or past teacher of Susan's. As demonstrated by § 300.344—the section that details the composition of an IEP team—the Department of Education was capable of mandating the presence of teachers at meetings under the IDEA. It did not do so in § 300.534.

## 2. Careful Consideration

Plaintiff argues that the SLRO erred in finding that the August, 2001, MFE team did not carefully consider all available relevant information in determining whether Susan was eligible for special educational services.

34 C.F.R. § 300.535 provides:

(a) In interpreting evaluation data for the purpose of determining if a child is a child with a disability under § 300.7, and the educational needs of the child, each public agency shall—

team described in paragraphs (a)(2) through (6) of this section;
(6) At the discretion of the parent or the agency, other individuals who have

knowledge or special expertise regarding the child, including related services personnel as appropriate; and
(7) If appropriate, the child.

(1) Draw upon information from a variety of sources, including aptitude and achievement tests, parent input, teacher recommendations, physical condition, social or cultural background, and adaptive behavior; and

(2) Ensure that information obtained from all of these sources is documented and carefully considered.

The SLRO concluded:

[F]rom the evidence presented, that the Multi-factored evaluation team in August of 2001, did not carefully consider the evidence as present in Student's file or did not have all the evidence available for review. Since most of these individuals had no personal knowledge about the Student, it was imperative that the file be complete and the team consider all the teachers' comments and reports. In addition, all aspects of Dr. Suter's report should have been available and apparently were not. The SLRO agrees with the IHO that the Neuropsychologist, Patsy Suter, evaluation reports were not carefully considered by this group.

Decision of the SLRO at 9.[3]

The Ericksons argue that the MFE team did not "draw upon information from a variety of sources" and ensure that the information was "carefully considered," as required by the regulations. They point to the fact that several of Susan's eighth grade teachers provided reports to the school district's special education supervisor, but these reports were not made available to the August, 2001, MFE team. According to defendants, these reports demonstrated how Susan's problems negatively affected her school performance.

The Ericksons also argue the MFE team did not adequately consider Dr. Suter's report. According to defendants, Dr. Suter's report was only made available to the MFE team members; it was not discussed or considered by the team. Only the limited test results of the Wechsler Intelligence Scale for Children III, which Susan scored a full scale IQ of 92, was considered. None of the related cognitive

---

**3.** Dr. Patsy Suter is a pediatric neuropsychologist who first evaluated Susan in September, 1999. As a result of the evaluation, Dr. Suter noted several weaknesses in Susan's abilities, including visual processing, recognizing objects from their integral parts, understanding complex instructions, deficits in rapid word tasks, verbal memory, and repeating back increasingly complex strings of letters and numbers. Overall, Dr. Suter found that Susan had specific difficulties in language abilities and executive functions, which include her ability to organize and work through tasks.

Dr. Suter diagnosed Susan with suffering from "late effects" of chemotherapy and radiation treatment. Late effects appear three to five years after treatment and are found to be more common in girls. Late effects include academic difficulties, a possible drop in IQ points, and cognitive difficulties.

As explained in Dr. Suter's April, 2000, report to the school district:

[Susan's] neurocognitive deficits are not uncommon following chemotherapy, do [sic] to the neurotoxicity of the drugs employed in the chemotherapy treatment. In essence, the drugs injure the developing brain, while they are destroying the cancer cells. Thus, although we can all be very grateful for Susan's survival, there are neurological side effects of her treatment which do not go away when treatment is completed, and will likely need to be addressed throughout her education and life.

Bd. Ex. 44.

After the MFE began in 2001, Dr. Suter reevaluated Susan and submitted her report to plaintiff in April, 2001. Dr. Suter's findings were not inconsistent with the neuropsychological evaluation of September, 1999. Dr. Suter found scattered neurocognitive deficits in the student's brain, scattered memory deficits, scattered executive function deficits, and difficulty in behavioral adjustment. Dr. Suter concluded that Susan was at risk both academically and socially, and, therefore, Susan required assistance in all academic areas.

or achievement tests were discussed. Defendants argue that the MFE team therefore failed to consider the significant "late effects" of Susan's cancer treatment. Likewise, defendants argue the MFE failed to consider the impact of Susan's orthopedic condition[4] and her severe depression[5] and their effect on her educational performance.

In response, the school district argues that the record establishes that the MFE conducted an extensive reevaluation of Susan, using information from teachers, classroom observation, achievement testing, occupational and physical therapy evaluations, social/emotional status evaluations, a speech therapy evaluation, and a work-study assessment of employability skills.

As for Dr. Suter's report, the school district argues that it was made available at the MFE meeting, and some of the team members read the report prior to the meeting. Plaintiff also points to Dr. Suter's testimony that having her report available at the meeting for members to read would be an appropriate way to consider her findings and conclusions. Moreover, it is standard procedure, according to plaintiff, for a MFE team to use only scores from intelligence testing—and not the total neuropsychological profile. Thus, plaintiffs argue that its consideration of Dr. Suter's report met its legal obligation.

Insufficient attention appears to have been given to the evidence concerning Susan's non-academic problems and especially to Dr. Suter's report, which was the only expert report assessing the effects of Susan's past history of treatment for leukemia on her present learning abilities.

---

4. Susan suffered multiple slow-healing bone fractures, as a result of her cancer treatment, prior to and at the time of the MFE decision.

5. In autumn, 2000, Susan attempted to harm herself. She was subsequently admitted to

The question whether the MFE team "carefully considered" all relevant information available to it is, however, difficult to answer based on the administrative record alone. Further complicating the analysis is the lack of any case law interpreting the regulation or setting an appropriate standard. Because defendants prevail on substantive issues, as discussed below, it is not necessary to resolve the procedural question of whether the MFE "carefully considered" all relevant information.

## B. Alleged Substantive Violations

Whether the SLRO properly concluded that Susan has an "other health impairment" and is therefore qualified for special education services is a two-step inquiry. The first, procedural step, is to determine whether, as plaintiff argues, the SLRO exceeded his authority when he addressed the merits and found Susan to be "other health impaired." If the SLRO could properly address the substantive merits of Susan's condition, the next step is an independent review of the administrative record to determine whether the SLRO's conclusion that Susan was "other health impaired" was correct.

### 1. The SLRO's Authority

The SLRO interpreted the following language from the IHO decision as a specific finding that Susan qualified for special education under the category of "other health impairment":

that special education services will be continued under the former IEP, including the use of a computer at the School District's expense until such time that the School District reevaluates that [sic]

the Kobacker Psychoeducational Center, an inpatient treatment center, where she received psychological therapy for eight day. Dr. Suter's report explained that Susan experienced slowed processing and significant distractibility as a result of the depression.

the Student under the MFE by the end of the school year. Decision of the SLRO at 13 (citing Decision of the IHO at 20).

Any other interpretation, according to the SLRO "would be inconsistent with the decision as written." *Id.*

■ According to the school district, the IHO did not specifically find Susan eligible for special education services, and, therefore, the SLRO's interpretation was erroneous. Plaintiff argues the IHO merely found that the MFE was procedurally insufficient. Thus, the IHO ordered the school district to reevaluate Susan by the end of the school year and to continue providing services to her under the "stay put" IEP. Consequently, because the IHO did not specifically conclude that Susan had an "other health impairment" and Susan and her mother did not appeal the IHO decision, plaintiff argues the decision whether Susan was eligible for special education services was not before the SLRO. Therefore, the SLRO had no authority to extend his decision to whether Susan was "other health impaired."

Contrary to plaintiff's analysis, however, the SLRO's interpretation of the IHO's decision is reasonable. Because the IHO found the termination of special education services for Susan to be improper, he ordered the school district to revert to the prior IEP that identified Susan with an "other health impairment." Thus, it makes sense that the SLRO interpreted the IHO's decision as finding that Susan still suffered from an "other health impairment." The SLRO, therefore, did not exceed his authority in stating that the IHO found Susan to be eligible for special education services.

Regardless, the Ericksons asked the IHO, in their request for a due process hearing, to find Susan as a child with an "other health impairment." Under the IDEA and its regulations, the state edu-

cational agency hearing an appeal from an impartial due process hearing is given broad authority to make a decision it deems appropriate.

Section 1415(g) states that the "officer conducting such review shall make an independent decision upon completion of such review." 34 C.F.R. § 300.510(b)(2) states that the state education agency conducting an impartial review of the due process hearing shall:

(i) Examine the entire hearing record;

(ii) Ensure that the procedures at the hearing were consistent with the requirements of due process;

(iii) Seek additional evidence if necessary . . . .

(iv) Afford the parties an opportunity for oral or written argument, or both, at the discretion of the reviewing official;

(v) Make an independent decision on completion of the review.

Accordingly, even if the SLRO's interpretation of the IHO decision was erroneous, the SLRO, under the authority of § 1415(g) and § 300.510(b)(2), had independent authority to conclude that Susan had an "other health impairment."

### 2. Whether Susan Was "Other Health Impaired"

Under the IDEA, "other health impairment" is defined as:

having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the education environment, that

(i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, and sickle cell anemia; and

(ii) Adversely affects a child's educational performance.

34 C.F.R. § 300.7(c)(9).

■ Therefore, to be "other health impaired," a child must 1) have limited strength, vitality, or alertness due to a chronic or acute health problem that 2) adversely affects a child's educational performance.

### a. Parties' Arguments

Under the first prong, the school district argues Susan does not suffer from limited strength, vitality, or alertness as a result of her diagnosis with leukemia seven years ago. According to plaintiff, since Susan began high school, she has not demonstrated any signs of physical limitation. Susan is able to attend school regularly, participate in the marching band and on the swim team, and keep up in classroom discussions. The only testimony about any alleged limitations of Susan's strength, vitality, or alertness, according to the school district, is from Susan's mother and sister regarding what they have observed at home.

On the contrary, the Ericksons argue that Susan suffers from "late effects" of chemotherapy and cranial radiation. The late effects have resulted in cognitive deficits, associated academic deficits, deficits in processing speed and distractibility, de-pression, psychomotor retardation, and general deficits in executive functioning. As a result of the cancer treatment, defendants also argue, Susan experiences frequent bone fractures. Defendants point to the testimony of Dr. Suter who opined that the late effects of Susan's cancer treatment are chronic, permanent, and negatively impact her strength, vitality, and alertness.

Under the second prong of the "other health impaired" definition, the school district argues that Susan's health problems do not adversely affect her educational performance. Plaintiff points to Susan's scores on cognitive and ability tests, her junior high and high school grades, and testimony from high school teachers.[6] This evidence demonstrates, according to plaintiff, that Susan is achieving commensurate with her ability level. Plaintiff further cites to other state education agency decisions that have found that medical diagnoses of processing or other types of deficits do not automatically result in adverse effects on educational performance. Thus, according to plaintiff, the MFE team was correct in concluding that because "Susan's academic achievement and classroom performance were commensurate with her general intellectual ability level," there was "no continued severe adverse effect on her educational performance." Pl.'s Reply at 9.[7]

---

**6.** Specifically, plaintiff points to Susan's IQ score, which is in the low-average range; her score on the Woodcock–Johnson norm-referenced achievement test, which was in the average to low-average range and was consistent with someone with her IQ; her score on the Stanford Achievement Group Assessment, where she was in the average to low-average range; and her ninth grade proficiency test, where she passed two sections and scored just below proficiency standards in the remaining three sections. Susan's grades were also all passing.

**7.** Not only does plaintiff argue that Susan is not "other health impaired," plaintiff also ar-gues that Susan does not need "special education," as it is defined in the regulations. The applicable regulation, 34 C.F.R. § 300.26(a)(1)(i), defines special education as "specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including [i]nstruction provided in the classroom, in the home, in hospitals and institutions, and in other settings." Susan's eighth grade IEP, which is currently in force as the stay put IEP during this proceeding, provides: "small group tutoring; extended time to complete tests or assignments as needed; use computer in classroom as needed; teachers provide a copy of notes and overheads." Bd. Ex. 45.

In response, the Ericksons argue that Susan's eighth grade teacher reports, Dr. Suter's evaluations, and the report from the Kobacker Center corroborate the SLRO's findings that Susan's condition adversely affects her educational performance. Defendants argue that Dr. Suter's reports demonstrate how Susan's loss in cognitive ability and executive functioning affects her "ability to organize herself, to break things down, to think her way through to get the most appropriate response, to sequence her way through things." Tr. 505. The eighth grade teachers reports indicate that Susan lacks the ability to control her impulses adequately, has difficulty finishing her assignments, has poor peer relationships, has difficulty prioritizing class work, experiences memory difficulties, and requires one-on-one instruction for math. According to defendants, these circumstances demonstrate that Susan's educational performance is adversely affected by her physical condition.

### b. The SLRO Decision

The SLRO found that Susan met the "other health impaired" definition. He concluded that the deficits described in Dr. Suter's report, "make it difficult for this Student to compete on equal ground with other students. . . . This qualifies a Student for OHI disability." Decision of the SLRO at 12.

The SLRO further found that the "School System's continued argument that the Student was not eligible for Special Education services for the reason that her educational performance was consistent with her intellectual ability ignores the disability suffered by this Student as a result of a cancer treatment." *Id.* Citing a paragraph from the IHO's decision, the SLRO concluded:

> Consequently, the reasoning of the School District, that the Student is not eligible for Special Education services because it adversely effects her education performance is an error. In fact, the services provided appeared to be nearly adequate and successful. Without services provided through the School, it is conceivable that her academic performance would suffer.

The SLRO agrees completely with this assessment.
*Id.* at 13.

### c. Analysis

■ As noted above, when reviewing claims under the IDEA, a district court must give "due weight" to the state administrative proceedings. *Burilovich,* 208 F.3d at 565. The Supreme Court has emphasized: "In assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034. State and local educational agencies are therefore deemed to possess expertise in education policy and practice. Administrative findings in an IDEA case "may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Burilovich,* 208 F.3d at 567.[8]

According to plaintiff, Susan's IEP demonstrates that Susan only requires accommodations and modifications to the regular education program. Citing to other state education agency decisions, plaintiff argues these accommodations are not "specially designed instruction" under the definition of special education. Therefore, these services could be provided to Susan on another type of assistance plan.

8. *Cf. Corchado v. Bd. of Educ., Rochester City School Dist.,* 86 F.Supp.2d 168, (W.D.N.Y. 2000). In *Corchado,* the Second Circuit held that normally district courts must give deference to the determinations of state and local officials who possess expertise in formulating

When there is a conflict between the local and state education agencies, however, "the court must defer to the state hearing officer's decision in reviewing the record on appeal." *Burilovich*, 208 F.3d at 567 (citing *Renner v. Bd. of Educ.*, 185 F.3d 635, 641(6th Cir.1999)).

■ Within this framework, the burden of proof remains on the school district as the party challenging the ruling of the administrative hearing officer. *Natchez–Adams Sch. Dist. v. Searing by Searing*, 918 F.Supp. 1028, 1032 (S.D.Miss.1996) (citations omitted).

■ The administrative record in this case thoroughly documents the long term health impact on Susan of her leukemia and subsequent treatment. The most persuasive evidence is Dr. Suter's April, 2001, report to the school district. Dr. Suter explained:

> From a neuropsychological perspective, the current pattern of findings suggests scattered inefficiencies in the operations of the brain. The current findings are not inconsistent with neuroimaging findings, nor are they inconsistent with Susan's medical history.
>
> Whatever the cause, the current neuropsychological protocol places Susan at risk with respect to both academic and social demands. She may have difficulty keeping pace in traditional classroom settings. She may experience difficulty with the efficient production of oral and

written responses and with the completion of assignments. Problems may become especially noticeable when tasks involve novel information, speeded production, or retrieval of newly learned information. It is strongly recommended that an individualized educational plan be developed and implemented to address Susan's documented neurocognitive deficits. She will require assistance in all academic areas, including reading, written expression, and math, if she is to learn and progress optimally.

> It is essential that those working with Susan remain aware that the documented neurocognitive deficits are based in brain function, and possibly represent negative effects of chemotherapy and radiation therapy at a relatively early age.

Bd. Ex. 80 at 4–5.

Dr. Suter concluded that "[a]cademic services and modifications be provided, based on the Other Health Impaired category of the Individuals with Disabilities Education Act." *Id.* at 5.

Additionally, the discharge summary from the Kobacker Center provided:

> Susan is on an IEP because she is medically fragile and uses a computer to do her written assignments in school. She will continue to require the Special Education services she is receiving to allow

---

educational programs for children with disabilities. The court then stated, however, that where:

> the issue before the Court is "whether the school district properly classified [the student] as an individual with or without a disability in the first instance," the Court is not bound by the rule of deference. *Muller v. Committee on Special Educ.*, 145 F.3d 95, 102 (2d Cir.1998). Whether a particular child's deficits satisfy the eligibility definitions set forth in relevant state and federal regulations is a matter of statutory interpre-

tation and "the state administrative officials [are] in no better position than the district court to make conclusions with respect to [the student's] statutory eligibility based on the record." *Id.* Accordingly, and consistent with *Muller*, this Court is "free to consider the issue of [student's] statutory eligibility de novo." *Id.*

*Corchado*, 86 F. Sup.2d at 172.

The Sixth Circuit has not made any such distinction. Thus, this court will abide by the rule from the decision in *Burilovich*.

her to have a successful school experience and work up to her level of ability. Bd. Ex. 58.

There is also a strong correlation between the medical opinion of Dr. Suter and the classroom observations of Susan's eighth grade teachers.

Given this evidence, the record supports a finding that Susan has a condition that results in "limited strength, vitality, or alertness ... with respect to the educational environment," and which has adverse effects on Susan's educational performance. 34 C.F.R. § 300.7(c)(9).

Although the school district has presented evidence that Susan does not suffer from physical or educational problems since her arrival in high school, the district has failed to present expert rebuttal testimony. Plaintiff did not present any evidence, either in the form of an expert's report or direct testimony from a medical professional, that the continuing effect from Susan's illness and treatment would not adversely affect her ability to learn. In the absence of such testimony, the preponderance of the evidence—the standard articulated in § 1415(i)(2)(B) of the IDEA—favors the Ericksons. The school district simply cannot sustain its burden of proof by asking this court to invalidate a licensed clinical psychologist/ pediatric neuropsychologist's opinion on the ground that Susan's test scores and grades do not show any physical or educational failure or on the school district's limited evaluations of Susan.

The Supreme Court has clearly repudiated the proposition that grades can serve as the IDEA's litmus test. The Court in *Rowley* stated: "We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.'" 458 U.S. at 203 n. 25, 102 S.Ct. 3034. The court in *Corchado* reiterated this point:

The IHO's reasoning, in effect, precludes a child whose academic achievement can be described as "satisfactory" from being able to demonstrate that documented disabilities adversely affected the student's academic performance. This should not and cannot be the litmus test for eligibility under the IDEA. The fact that a child, despite a disability, receives some educational benefit from regular classroom instruction should not disqualify the child from eligibility for special education benefits if the disabilities are demonstrated to "adversely affect the child's educational performance." 34 C.F.R. 300.7.... Each child is different, each impairment is different, and the effect of the particular impairment on the particular child's educational achievement is different. While [student's] academic performance in relation to his peers is one of many tools that may be considered in determining "adverse affect", denying him special education benefits because he is able to pass from grade to grade despite documented impairments that adversely affect his educational performance is wrong.

86 F.Supp.2d at 176.

The school district's main argument that Susan is not eligible for services is that her academic achievement accords with her ability. Because Susan's IQ score is within the expectation range of her achievement scores, the school district argues Susan is not in need of special education. This presents an interesting and complex issue of educational policy—whether special education services are required if a student is achieving her potential. This court, however, will not decide that issue.

In this case, the only expert has testified that Susan has a chronic health problem that will adversely affect her educational performance. The SLRO reviewed the

record, and in his opinion, Susan required special education. As the Sixth Circuit concluded in *Burilovich,* "the 'preponderance of the evidence' language in the [IDEA] 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" 208 F.3d at 566 (citing *Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 624 (6th Cir.1990)). "Indeed, federal courts are generalists with no expertise in the educational needs of handicapped children and will benefit from the factfinding of a state agency, which is presumed to have expertise in the field." *Id.*

The evidence before this court demonstrates the SLRO's decision was justified based on the SLRO's presumed educational experience and a fair estimate of the testimony and other evidence. *See Burilovich,* 208 F.3d at 567.

The SLRO's decision is therefore upheld. Having considered the case file and administrative record, plaintiff's motion for judgment based on the record is denied.

Under § 1415(i)(2)(B), this court has the authority to "grant such relief as the court determines is appropriate." Under the preponderance of the evidence standard, defendants are granted judgment based on the administrative record. Considering that Susan will be nearly half way finished with her high school career by the time the decision whether she was entitled to special educational assistance as she entered high school is reached, I find that defendants would not be prejudiced by changing their motion for summary judgment into a

motion for judgment based on the administrative record.[9]

## CONCLUSION

It is, therefore,

**Ordered that**

1. Susan Erickson is eligible for special education under the Other Health Impairment classification.

2. Defendants are granted judgment based on the administrative record.

3. Plaintiff's motion for judgment based on the administrative record be, and hereby is, denied.

**So ordered.**

---

**9.** Under the reasoning of *Nashville Public Schools,* 133 F.3d at 387, summary judgment in IDEA cases should only be granted if no issue of material fact remains. If the evidence in this case is construed in the light most favorable to the school district, it is quite possible that a reasonable juror could conclude that Susan's achievement scores, grades, and teacher testimony somehow demonstrate that Susan does not require special education. Defendants' motion for summary judgment is therefore denied. As explained above, however, defendants will be granted judgment based on the administrative record.